UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.

ANTONIO PATTERSON,

      Defendant.

Case No. 22-cr-20269

HON. MARK A. GOLDSMITH

_____/

**OPINION & ORDER
DENYING DEFENDANT'S MOTION TO SUPPRESS (Dkt. 23)**

Defendant Antonio Patterson is charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Indictment (Dkt. 13). Before the Court is his motion to suppress a firearm that was seized and a statement that he made during an investigative detention by Detroit Police Department (DPD) officers on May 1, 2021 (Dkt. 23). For the reasons set forth below, the Court denies the motion.[1]

## I. BACKGROUND

On May 1, 2021, DPD officer Patrick Jones and his two partners were on patrol at a gas station at the corner of Braille Street and West 7 Mile Road in Detroit, Michigan. Hr'g Tr. at 14, 16 (Dkt. 29). The officers went to that location because of a recent increase in the number of weapons offenses there, and they were targeting weapons offenses and shootings. Id. at 14. The officers were dressed in modified class officer uniforms. Id. at 15. They rode in a semi-marked police car.

---

[1] In addition to the motion, the briefing includes the Government's response (Dkt. 26), Patterson's reply (Dkt. 27), and supplemental briefs filed by the Government and Patterson (Dkts. 31, 32, 36, 37). The Court held hearings on the motion on February 28, 2023 and May 18, 2023.

Id. Jones was armed with his service weapon, and he had a police badge on his chest. Id. at 16. He sat in the rear of the car behind the driver. Id. at 46. He has four years of training and experience as a DPD officer and identifies makes and models of firearms as part of his job. Id. at 8–9.

At around 9:49 p.m., while the officers circled the parking lot, Jones observed Patterson leave the gas station with a bag in his hand and walk toward Braille Street. Id. at 16–17. Jones saw Patterson, who was wearing a zip-up hooded sweatshirt with a right and left pocket, pat the left pocket of the sweatshirt as he exited the gas station. Id. at 17, 18, 58. Jones and Patterson then made eye contact, after which, according to Jones, Patterson's body movement changed. Id. at 17. Instead of naturally swinging his arms as he walked, Patterson stiffened his left arm and held it closer to his body, over the left pocket that Jones saw him pat. Id. at 19. In addition, Patterson went from completely facing Jones to "blading" the left side of his body away from Jones so that the left pocket was out of Jones's view. Id. at 24, 26.

Jones could not tell exactly what was in the pocket, but he suspected that Patterson was carrying a firearm. Id. at 20. When Patterson patted the left pocket—which, unlike the right pocket, was weighed down—the pocket revealed to Jones an L-shaped object that was consistent with the size and shape of a firearm in Jones' experience. Id. at 21. Jones also believed that, in stiffening his arm, Patterson was trying to prevent a heavy object from swaying in his pocket as he walked, which would be consistent with trying to conceal a firearm, rather than a phone or some other object. Id. at 21. Jones believed that Patterson was committing some type of crime— possibly carrying a concealed weapon—that he needed to further investigate. Id. at 20.

Jones decided to approach Patterson. Id. at 26–27. One of his partners drove the police car toward Patterson and blocked Patterson's path. Id. at 27, 47. Jones and his partners exited the car.

Id. at 47. Jones walked toward Patterson and met him at the corner of the gas station parking lot, right before Braille Street. Id. at 27. Patterson raised both hands in the air. Id. at 47. As he approached, Jones continued to assess whether Patterson was carrying a firearm in his pocket. Id. at 28. He did not see any part of a gun protrude from Patterson's clothing, but he saw the full imprint of a firearm inside the pocket. Id. at 59.

Jones reached for and grabbed the outer portion of Patterson's left pocket with his right hand, exposing the grip of the firearm, and simultaneously asked Patterson, "What is this?" Id. at 60; Jones Body-Worn Camera Footage at 00:30–00:37. Patterson did not respond. Before reaching out to touch the firearm, Jones was "confident" that the pocket contained a firearm. Hr'g Tr. at 29. After grabbing the outer portion of the pocket, he was "100 percent sure" that it contained a firearm. Id. Jones then reached his left hand into the pocket and removed the firearm. Id. at 61; Jones Body-Worn Camera Footage at 00:30–00:37.

After removing the firearm, Jones grabbed Patterson's right arm, and another officer assisted him in detaining Patterson. Hr'g Tr. at 49. Jones asked Patterson, "You a CPL [concealed pistol license] holder, boss?" Jones Body-Worn Camera Footage at 00:30–00:37. Paterson responded, "No." Id.

Patterson was arrested and taken to the police car. The officers then used the Law Enforcement Information Network (LEIN) database and confirmed that Patterson did not have a CPL. Resp. at 5.

## II. STANDARD OF DECISION

The Government bears the burden of justifying a warrantless search and seizure. United States v. Pollard, 215 F.3d 643, 648 (6th Cir. 2000). "The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops

3

of persons or vehicles that fall short of traditional arrest." United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting Terry v. Ohio, 392 U.S. 1, 9 (1968)).  The United States Court of Appeals for the Sixth Circuit has stated that "there are three types of permissible encounters between the police and citizens" under the Fourth Amendment: "(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause." United States v. Waldon, 206 F.3d 597, 602 (6th Cir. 2000) (punctuation modified).  Patterson and the Government agree that the interaction between Patterson and Jones was an investigative detention and that Patterson was seized within the meaning of the Fourth Amendment.  Def. 1st Suppl. Br. at 10 (Dkt. 32); Gov't 1st Suppl. Br. at 2 (Dkt. 31); Resp. at 5–6.

An officer can stop and briefly detain a person only when the "officer has reasonable, articulable suspicion that [a] person has been, is, or is about to be engaged in criminal activity." United States v. Atchley, 474 F.3d 840, 847 (6th Cir. 2007) (punctuation modified); see also United States v. Sokolow, 490 U.S. 1, 7, (1989) ("[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause."); United States v. Wilson, 506 F.3d 488, 492 (6th Cir. 2007) (defining a Terry stop as a type of encounter between police officers and citizens "that is characterized as a temporary involuntary detention . . . which must be predicated upon reasonable suspicion on the part of the officers that criminal activity is afoot") (punctuation modified).

To determine whether a particular stop is permissible under the Fourth Amendment, a court "must look at the totality of the circumstances of [the] case to see whether the detaining officer

4

has a particularized and objective basis for suspecting legal wrongdoing." United States v. Pearce, 531 F.3d 374, 380 (6th Cir. 2008). An "officer must be able to articulate more than an inchoate and unparticularized suspicion or 'hunch' of criminal activity" to justify an investigatory stop. Illinois v. Wardlow, 528 U.S. 119, 123–124 (2000). Instead, the officer must be "able to articulate some minimal level of objective justification for making the stop," Waldon, 206 F.3d at 604, based upon "specific reasonable inferences which [the officer] is entitled to draw from the facts in light of [his or her] experience." Terry, 392 U.S. at 27. Thus, reasonable suspicion requires more than a mere hunch, but it is "satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard." United States v. Campbell, 549 F.3d 364, 370 (6th Cir. 2008) (punctuation modified).

After detaining a person for a Terry stop, the officer may conduct a "reasonable search for weapons . . . where [the officer] has reason to believe that [he or she] is dealing with an armed and dangerous individual." Terry, 392 U.S. at 27. The officer must be able to "point to particular facts from which [he or she] reasonably inferred that the individual was armed and dangerous." Sibron v. New York, 392 U.S. 40, 64 (1968). Whether there is reasonable suspicion to believe that an individual is armed and dangerous is an objective inquiry that depends on the totality of the circumstances. United States v. Noble, 762 F.3d 509, 522 (6th Cir. 2014).

### III. ANALYSIS

Patterson seeks to suppress the firearm and statement he made to DPD officers on May 1, 2021. Mot. at 1. He contends that, when Jones approached and grabbed him, Jones commenced an illegal seizure, in violation of the Fourth Amendment and Terry. Def. 1st Suppl. Br. at 9–12. He asserts that Jones had neither reasonable suspicion nor probable cause to detain him and search him for

5

weapons. Mot. at 6–10; Def. 1st Suppl. Br. at 9–12. He also argues that the Court should suppress statements made in response to Jones's questions about his CPL status.

**A. Jones's Reasonable Suspicion of Criminal Activity Supported His Detention of Patterson**

The Court finds that Jones had reasonable suspicion that Patterson was engaged in criminal activity and that this suspicion entitled him to stop Patterson.

Michigan law prohibits carrying a concealed pistol on one's person or in a vehicle without a license. Mich. Comp. L. § 770.227(2). A person must have the license with him or her "at all times [the person] . . . is carrying a concealed pistol" and must "show" the license "upon request" by a police officer. Id. § 28.425f. When stopped by a police officer, the weapon holder "shall immediately disclose to the [police] officer" that he or she is carrying a pistol. Id. Interpreting Michigan law, courts have, therefore, explained that the carrying of a concealed pistol is a prima facie violation of the law, subject to a defendant's right to defend by producing evidence of licensure. United States v. Williams, 483 F. App'x 21, 27 (6th Cir. 2012) (citing United States v. Galaviz, 645 F.3d 347, 356 (6th Cir. 2011)); United States v. Culver, 22-cr-20112, 2022 WL 17684318, at *4 (E.D. Mich. Oct. 18, 2022), report and recommendation adopted 2022 WL 17682633 (E.D. Mich. Dec. 14, 2022); United States v. Graham, 2022 WL 4099447, at *4 (E.D. Mich. Sept. 7, 2022); United States v. Mims, No. 20-20323, 2021 WL 6049406, at *3 (E.D. Mich. Dec. 21, 2021); see also Mich. Comp. L. § 776.20 (stating that in any prosecution for violating a Michigan law that relates to the possession of firearms, "the burden of establishing any exception" is on the defendant, but "this does not shift the [prosecution's] burden of proof for the violation").[2]

---

[2] Patterson argues that presumptively unlawful concealed carry under Michigan law contradicts the United States Supreme Court's rule that there is no "automatic firearm exception" to the Terry rule. Reply at 4 (quoting Florida v. J.L., 529 U.S. 266, 272 (2000)). Patterson, however, quotes the Supreme Court's statement out of context. In Florida v. J.L., the officers' suspicion that the

Following the production of evidence of licensure, the state has the burden of proving beyond a reasonable doubt that the defendant was not licensed. See Mims, 2021 WL 6049406, at *3; People v. Henderson, 218 N.W.2d 2, 4 (Mich. 1974). The lack of a license is not an element of the offense of carrying a concealed weapon that the state must prove. See Henderson, 218 N.W.2d at 4.

Based on the totality of the circumstances as they existed at the time that Jones approached Patterson, Jones had a particularized and objective basis for suspecting that Patterson was violating Michigan law that prohibits carrying a concealed weapon without a license. Jones testified that he decided to approach Patterson after seeing him try to conceal what appeared to be a firearm in the left pocket of Patterson's sweatshirt. He stated that he observed an L-shaped object in the left pocket that, in his experience, was consistent with the size and shape of a firearm. Hr'g Tr. at 21–22. He also testified that, unlike the right pocket, the left pocket of Patterson's sweatshirt was weighed down, which suggested that there was a somewhat heavy L-shaped object in that pocket. Id. at 23. Jones and Patterson made eye contact as Patterson exited the gas station, after which Patterson's body movement changed. Id. at 17. Patterson stiffened his left arm and held it closer to the left side of his body, over the left pocket, and he "bladed" away so that the left side of his body was out of Jones's view. Id. at 21, 24. To Jones, this change in body movement suggested

---

suspect was carrying a weapon "arose not from any observations of their own but solely from a call made from an unknown location by an unknown caller." 529 U.S. at 270. But the Government argued in that case that the standard Terry analysis should be modified to permit a "firearm exception," under which an anonymous tip "alleging an illegal gun would justify a stop and frisk even if the accusation would fail standard pre-search reliability testing." Id. at 272 The Court declined to adopt this suggestion and held that an anonymous tip that a person is carrying a gun is not, without more, sufficient to justify a police officer's stop and frisk of that person. Id. Instead, it reaffirmed the reasonable suspicion standard for stops and frisks. Id. Unlike J.L., Patterson's case does not involve a tip from an anonymous third party. Rather, it involves Jones's own observations. The proposed "automatic firearm exception" discussed in that case has no relevance here. And both parties analyze the lawfulness of the stop and frisk under the reasonable suspicion standard affirmed in J.L. The Court applies that standard.

that Patterson was attempting to conceal what Jones suspected could be a firearm in the left pocket. Id. at 20–21. In addition, Jones believed that, in stiffening his arm and holding it closer to his left side, Patterson was trying to prevent a heavy object from swaying in his pocket as he walked, which would be consistent with trying to conceal a firearm, rather than a phone or some other object. Id. at 21. Jones further testified that, at the time he approached Patterson, he considered the fact that he was patrolling an area due to an increased number of weapons offenses there and that it was nighttime, a time at which there is relatively more criminal activity. Id. at 7, 15, 29.

With these observations and conclusions drawn by Jones's experience, Jones had reasonable suspicion that Patterson was carrying a concealed weapon without a license, and he was, therefore, justified in conducting a stop to investigate whether Patterson was engaged in criminal activity. See United States v. Bell, 572 F. App'x 417, 419 (6th Cir. 2014) (finding that belief of officer, who was seated in a squad car and saw defendant walking on the street, "based on his eyewitness observations, that the defendant had a bulge in his pocket that was in the shape of a gun provide[d] 'reasonable suspicion' under the Terry doctrine that the defendant was carrying a concealed pistol"; noting that the fact that the events happened in a Detroit area where recent robberies and shootings had occurred "ma[de] a persuasive case for the stop in the first instance"); United States v. Pope, 212 F. App'x 214, 217–218 (4th Cir. 2007) (determining that, when officers personally observed what appeared to be the outline of a gun concealed beneath the defendant's clothing in a state in which possession of a concealed weapon is a criminal offense, they had a particularized and objective basis for an investigative detention); United States v. Freeman, 2022 WL 1194058, at *5 (E.D. Mich. April 21, 2022) (finding that an L-shaped bulge in the defendant's pocket provided reasonable suspicion to stop and frisk the defendant and noting that "[t]he presence of a

8

concealed pistol on the person is sufficient by itself to constitute probable cause to believe a person is committing the crime of illegally carrying a concealed weapon under Michigan law").

Relying on Northrup v. City of Toledo Police Dep't, 785 F. 3d 1128 (6th Cir. 2015) and United States v. Black, 707 F.3d 531 (4th Cir. 2013), Patterson contends that the mere possession of a firearm is insufficient to provide the reasonable suspicion of criminal activity needed for an investigatory detention. Reply at 1–4. But both of those cases involved the open carry of firearms on one's person in states in which such activity was presumptively lawful. For instance, in Northrup, the court held that an officer's observation of an individual openly carrying a firearm did not create reasonable suspicion of criminal activity to justify stopping, disarming, and handcuffing the individual. 785 F. 3d at 1131–1132. It pointed to the fact that, in Ohio, "not only has the State made open carry of a firearm legal, but it also does not require gun owners to produce or even carry their licenses for inquiring officers." Id. at 1132. Because carrying a gun openly was not a criminal offense, the court explained, there was no basis for the stop. Id. In contrast, Patterson was carrying a concealed weapon, which is presumptively unlawful in Michigan. See Mich. Comp. L. § 770.227(2); see also Mims, No. 20-20323, 2021 WL 6049406, at *2.

Indeed, numerous cases in this district have found that, due to the differences between Ohio and Michigan law, Northrup is inapplicable to motions to suppress in which the defendant is charged with violating Michigan's concealed carry law. See, e.g., United States v. Culver, 22-cr-20112, 2022 WL 17684318, at *4 (E.D. Mich. Oct. 18, 2022), report and recommendation adopted 2022 WL 17682633 (E.D. Mich. Dec. 14, 2022) ("In Ohio, carrying a firearm is presumptively legal, whereas in Michigan, it is a prima facie violation of state law that is rebuttable by raising the issue of licensure and offering proof that the possession was lawful . . . . This difference in legal presumptions has been noted by numerous judges in this district . . . . Thus, Northrup does

not support Culver's argument that his possession of the firearm was presumptively lawful."); Graham, 2022 WL 4099447, at *5 (rejecting defendant's argument, made in reliance on Northrup, that officers need evidence of criminality or dangerousness beyond mere possession a weapon before they can detain and disarm an individual because "Northrup dealt with the open carrying of a gun in Ohio, whose law did not create a rebuttable presumption that such practice was illegal and did not even require gun owners to carry their licenses"); United States v. Bridges, No. 16-20089, 2016 WL 3922354, at *6 (E.D. Mich. July 21, 2016) (distinguishing Northrup from defendant's case, in which defendant was stopped and frisked after officers observed the outline of a gun in his pocket, because Northrup "addressed the open carry of a firearm in Ohio, whereas here, the defendant concealed the firearm," and such activity is presumptively illegal in Michigan).

Likewise, Black is distinguishable from this case. There, the court found that an officer did not have reasonable suspicion to detain the defendant based solely on the fact that the defendant was openly carrying a firearm in a state where it was legal to do so. 707 F.3d at 540. It relied on the fact that it was "undisputed that under the laws of North Carolina, which permit its residents to openly carry firearms . . . [the defendant's] gun was legally possessed and displayed" and held that "where a state permits individuals to openly carry firearms, the exercise of this right, without more, cannot justify an investigatory detention." Id. Again, Patterson was not engaging in presumptively lawful behavior by openly carrying a firearm. Rather, he was suspected of engaging in the presumptively unlawful behavior of concealing a firearm. See Mims, 2021 WL 6049406, at *2 (stating that Northrup and Black have "no value for assessing suspicions of criminality" when Michigan's concealed carry law applies).

Patterson also relies upon United States v. Floyd, in which the court granted the defendant's motion to suppress evidence of a firearm seized from his person when officers "saw an individual

10

exiting a liquor store with his purchase, and an inch of an extended magazine" on his body. No. 21-cr-20010 at 2–4, 2021 WL 2805806 (E.D. Mich. July 6, 2021). There, the court distinguished Terry because the suspect in Terry "acted suspiciously," id. at 3, and this distinction applies here. Jones "had reason to believe that [the] individua[l] at the site of the encounter [was] engaged in dangerous and criminal activity, and they identified an armed individual who seemed to be attempting to hide his weapon." Mims, 2021 WL 6049406, at *4 (distinguishing Floyd on this basis and explaining that "[t]he officers suspected that Mims was armed and dangerous and involved in criminal activity based not only on his possession of a presumptively illegal firearm, but also on Mims's suspicious behavior at a location suspected to hold individuals involved in an illegal shooting. The officers thus had a particularized and objective basis for suspecting the particular person stopped of criminal activity.") (punctuation modified).

Because Jones had particularized reasons to suspect that Patterson was carrying a concealed weapon, he was permitted to stop Patterson.

Patterson contended in his first supplemental brief that the "presumption that anyone carrying a concealed gun is doing so unlawfully flies against the Constitution and puts the burden to prove otherwise on a defendant." Def. 1st Suppl. Br. at 13. After the Court directed the parties to file supplemental briefing regarding any constitutional issues not already raised or fully briefed, Patterson submitted a second supplemental brief in which he states that he does not challenge the constitutionality of Michigan law that prohibits carrying a concealed weapon without a license but argues that the Court should "consider the principles set out in N.Y. State Rifle & Pistol Assoc., Inc. v. Bruen, 142 S. Ct. 2111 (2022), and due process concerns to inform the reasonable suspicion analysis in this case." Def. 2d Suppl. Br. at 2 (Dkt. 36).

11

However, as Patterson acknowledges, see Def. 2d Suppl. Br. at 2 n.2, Michigan is a "shall issue jurisdiction"—in which "authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability," Bruen, 142 S. Ct. at 2123–2124. The Bruen Court deemed such enactments as valid. Id. The Bruen Court also explained that state laws that eliminated concealed carry, while leaving open the option to carry openly, were consistent with the nation's historical tradition of firearm regulation. Id. at 2150.

Further, as the Government notes, the United States Court of Appeals for the Sixth Circuit has recognized in the context of reasonable suspicion determinations the validity of Michigan's statutory scheme, in which showing that a defendant carried a pistol in a vehicle establishes a prima facie violation of state law, and the defendant has the burden of offering proof of licensure. See Williams, 483 F. App'x at 27 (finding that officers' seizure of a firearm was based on a reasonable suspicion of criminality because Michigan law that "make[s] it a crime to carry a pistol 'concealed or otherwise, in a vehicle operated or occupied by' the carrier" establishes that "merely showing that a defendant carried a pistol in a vehicle he owns or operates establishes a prima facie violation of state law; at that point, it is up to the defendant to raise the issue of licensure and offer proof that his possession was lawful"). As several courts in this district have explained, this same law applies to carrying a concealed weapon on one's person. See, e.g., Mims, 2021 WL 6049406, at *3 (citing Mich. Comp. L. § 750.227(2)).

In addition, the Michigan Supreme Court has rejected the suggestion that Michigan's firearm statute impermissibly shifts the burden of proof to the defendant. Interpreting the phrase "without a license" in the statute, it has explained that the statute does not "absolve[] the state from proving one element of a crime, for to do so would vitiate the presumption of innocence," but rather

12

represents "an appropriate legislative expression that lack of a license is not an element of the offen[s]e." Henderson, 218 N.Wd.2d at 616–617. Thus, the language "without a license" "does not add an element to the crime, but simply acknowledges that a person may be authorized . . . to carry a pistol" because a license "is the permission by competent authority to do an act which, without such permission, would be illegal." Id. at 616.

Consistent with Henderson, the Michigan law governing prosecution for firearms offenses states that "the burden of establishing any exception" is on the defendant, but "this does not shift the [prosecution's] burden of proof for the violation." Mich. Comp. L. § 776.20.

Michigan law, which has the single element of carrying a concealed weapon and places the burden of raising the issue of a license on the defendant, is not inconsistent with Bruen or due process principles.

**B. Jones's Search for Patterson's Firearm and Seizure of the Firearm During the Investigative Detention Was Lawful**

Jones's search for Patterson's firearm and seizure of the firearm during the investigative detention was supported by Jones's reasonable suspicion that Patterson was armed and dangerous. During a Terry stop, "a reasonable search for weapons for the protection of the police officer, where [the officer] has reason to believe that [he or she] is dealing with an armed and dangerous individual, regardless of whether [he or she] has probable cause to arrest the individual for a crime," is permissible. Terry, 392 U.S. at 27 (finding that officer's actions in patting down the outer clothing of defendants, placing his hands in their pockets after he felt weapons, and then reaching for and removing guns was reasonable); see also Arizona v. Johnson, 555 U.S. 323, 323 (2009) (explaining that an officer performing a Terry stop may not automatically frisk the individual subject to the stop but that, rather, to perform a frisk, the officer must have some articulable suspicion that the subject is armed and dangerous). An officer need not "be absolutely

13

certain that the individual is armed; the issue is whether a reasonably prudent [person] in the circumstances would be warranted in the belief that [his or her] safety or that of others was in danger." Terry, 392 U.S. at 27. Because the search is "for the limited purpose of ensuring the safety of the officer and others around him, the search must be confined in scope to an intrusion reasonably designed to discover weapons that could be used to assault the officer." United States v. Stennis, 457 F. App'x 494, 499 (6th Cir. 2012) (punctuation modified).

As noted, Jones suspected that Patterson was concealing a firearm in his pocket based on visible indications of a firearm, such as the shape and weight of the object in the pocket, and the fact that Patterson covered the pocket with his left arm and turned his body away from Jones after making eye contact with Jones. "The suspicion that the defendant had a pistol in his pocket completes the basis for the frisk and makes it reasonable." Bell, 572 F. App'x at 419; see also United States v. McMullin, 739 F.3d 943, 945 (6th Cir. 2014) (explaining that, in some circumstances, the same reasonable suspicion that justifies stopping a suspect also justifies frisking a suspect). Moreover, as Jones approached Patterson, he saw the full imprint of a firearm in Patterson's left pocket. Hr'g Tr. at 59. "The officer's perception of a bulge suspected to be a weapon provides reasonable suspicion that the individual may be armed and dangerous." United States v. Stennis, 457 F. App'x 494, 499 (6th Cir. 2012); see also United States v. Pope, 910 F.3d 413, 416 (8th Cir. 2018) (finding that, in state in which carrying a concealed weapon is presumptively unlawful until an individual comes forward with a permit, an officer had reasonable suspicion to conduct a Terry frisk for weapons when officer observed suspect place gun in his waistband). It was reasonable for Jones to search for what he suspected to be a weapon and then, upon receiving confirmation that Patterson had a weapon, to seize the weapon. See United States

v. Strahan, 984 F.2d 155, 158 (6th Cir. 1993); Pope, 212 F. App'x at 218; Bridges, 2016 WL 3922354, at *6.

Moreover, "[i]t is well established that safety concerns are an integral factor in the Terry-stop equation." Campbell, 549 F.3d at 371. Jones testified that he does not always remove firearms from individuals when investigating whether they have a CPL or are carrying a concealed weapon without a license. Hr'g Tr. at 32. Rather, he considers the safety of himself, other officers, and any surrounding members of the public, as well as the risk that the individual will flee with the weapon. Id. at 32–33. He stated that, in deciding to seize Patterson's firearm while he investigated whether Patterson was carrying a concealed weapon without a license, he considered the increased number of weapons offenses in the area in which he stopped Patterson, the limited visibility at nighttime, and Patterson's action of turning his body away from Jones. Id. at 33. In addition, Jones testified that, in his experience, when he stops CPL holders, they usually inform Jones that they are armed and volunteer their licenses, while non-CPL holders usually attempt to conceal their weapons. Id. at 37. After he was stopped, Patterson did not disclose to Jones that he was armed, as Michigan law requires CPL holders to do. See Mich. Comp. L. §28.425(f). Jones testified that, if it appears to him that an individual is going to be arrested for carrying a concealed weapon, the suspect's ready access to a firearm can pose a danger to Jones or other officers. Hr'g Tr. at 33–35. The concern of officer safety justified Jones's search for and seizure of the firearm. See Johnson, 555 U.S. at 327.

Jones's search for the firearm was also reasonable in scope and duration. Upon approaching Patterson, Jones grabbed the outer portion Patterson's left pocket with his right hand, exposing the grip of the firearm, while simultaneously asking Patterson, "What is this?" Hr'g Tr. at 60; Jones Body-Worn Camera Footage at 00:30–00:37. Jones then reached his left hand into the pocket and

removed the firearm. Id. at 61; Jones Body-Worn Camera Footage at 00:30–00:37. After removing the firearm, Jones asked Patterson whether Patterson was a CPL holder, and Patterson responded that he was not. Jones Body-Worn Camera Footage at 00:30–00:37.

Patterson relies on several cases in support of his argument that Jones was not entitled to perform a protective search for weapons, but those cases involve frisks that were not supported by any particularized, objective suspicion that the suspect was armed and dangerous. See Reply at 4–5 (citing United States v. House, 463 F. App'x. 783, 789 (10th Cir. 2012); United States v. Leo, 792 F.3d 742, 752 (7th Cir. 2015); United States v. Williams, 731 F.3d 678, 688 (7th Cir. 2013)).

For instance, in House, the court found that an officer lacked reasonable suspicion to frisk the defendant when the officer saw what appeared to be a bulge under the defendant's pocket and a folded knife sticking out of the pocket but had no articulable reason to believe the defendant otherwise engaged in criminal activity. 463 F. App'x at 788. It explained that "[t]o allow a search based on the hunch that a citizen walking down the street is illegally carrying a firearm, without more," violates the Fourth Amendment. Id. at 789. Here, Jones had more than a mere hunch that Patterson was illegally carrying a firearm prior to the frisk. As he approached Patterson and before he seized Patterson's firearm, he saw the full imprint of the firearm in Patterson's pocket, and he was "confident" that the pocket contained a firearm. Hr'g Tr. at 29, 59.

The circumstances in Leo and Williams are likewise different than the circumstances in this case. In Leo, the court held that law enforcement's full search of the defendant's backpack exceeded the bounds of Terry and could not be justified by safety concerns when, at the time of the search, the defendant was handcuffed and out of reach of the backpack, and officers had frisked him and found no weapons. 792 F.3d at 749–752. It determined that the mere possibility of a gun in the backpack did not pose a threat that justified a full search of the bag on less than probable

cause. Id. at 752. In contrast, Jones observed the imprint of a firearm in Patterson's pocket, the firearm was directly within reach Patterson's reach, and Jones's actions in conducting a search for and removing the firearm did not exceed the scope of Terry.

In Williams, the court found that a frisk was impermissible when it was based on the fact that a group of people, in general, avoided eye contract with police officers and the fact that the defendant had his hands in his pocket or near his waistband, avoided eye contact, and began to move away from the area after police arrived. 731 F.3d at 686–688. Unlike that case, Jones observed visible indications of a firearm in Patterson's pocket, and Jones had particularized, objective suspicion that Patterson was armed.

Jones conducted a permissible search for weapons as part of his investigative detention of Patterson and lawfully seized Patterson's firearm.

**C. During the Stop, Jones Was Permitted to Ask Patterson Whether Patterson Was A CPL Holder**

Patterson also argues that the Court should suppress his response to Jones's question regarding whether he had a CPL. During an investigative detention, "the officer may ask the detainee a moderate number of questions to determine [the detainee's] identity and to try to obtain information confirming or dispelling the officer's suspicions." United States v. Butler, 223 F.3d 368, 374 (6th Cir. 2000). The detainee does not have to respond, and, unless the detainee's answers provide an officer with probable cause for arrest, he or she must be released. Berkemer v. McCarty, 468 U.S. 420, 439–440 (1984). To confirm or dispel the suspicion that a detainee is illegally possessing a firearm, it is permissible for an officer to as a detainee during a Terry stop whether he or she has a CPL. See United States v. Capozzoli, No. 22-20005, 2022 WL 3044818, at *6 (E.D. Mich. Aug. 2, 2022).

17

Here, Jones suspected that Patterson was carrying a concealed weapon without a license. After removing Patterson's weapon, Jones asked Patterson whether he was a CPL holder, and Patterson responded, "No." Jones's question was a reasonable inquiry aimed at confirming his suspicion that Patterson was illegally carrying a concealed weapon. Further, when Jones observed Patterson's firearm and when Patterson failed to produce a CPL upon being stopped—and confirmed he did not have a CPL—Jones had probable cause to arrest Patterson. See Mich. Comp. L. § 770.227(2); id. § 28.425f. Therefore, there is not a basis for suppressing Patterson's statement.[3]

### IV. CONCLUSION

For the reasons stated above, the Court denies the motion to suppress (Dkt. 23).

SO ORDERED.

Dated: June 30, 2023  
       Detroit, Michigan

s/Mark A. Goldsmith  
MARK A. GOLDSMITH  
United States District Judge

---

[3] Because the Court finds that the investigative detention did not violate the Fourth Amendment, it need not address the parties' arguments about whether the doctrine of inevitable discovery applies.

18